**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ENVIRONMENTAL WORKING GROUP, ET AL.**,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES FOOD AND DRUG ADMINISTRATION, ET AL.**,<br><br>Defendants. | Case No. 1:16-cv-2435-TNM |

## MEMORANDUM OPINION

The Plaintiffs, Environmental Working Group (EWG) and Women's Voices for the Earth (WVE), oppose the use of formaldehyde and formaldehyde-producing chemicals in hair-straightening products, contending that they constitute a serious health risk. In 2011, EWG filed a Citizen Petition with the U.S. Food and Drug Administration, asking the FDA to investigate deceptive labelling of such products, require appropriate labelling, and consider implementing a complete ban on formaldehyde-releasing chemicals in hair-straightening products. Frustrated by the FDA's failure to provide a substantive response, EWG filed suit in 2016 along with WVE, contending that action on the Petition was legally required. Although the FDA issued a formal response to the petition in 2017, the Plaintiffs amended their complaint, and now seek an order requiring the FDA to grant the petition and initiate rule-making processes.

Before a federal court can rule on such an issue, the constitutional requirement of injury-in-fact must be satisfied, and I conclude that the Plaintiffs here have not satisfied the requirements for either organizational or associational standing. With no alleged injury to the Plaintiffs' ability to conduct their standard programs, they cannot manufacture standing by

explaining how they have spent additional resources to combat the FDA's alleged illegal inaction. And with only allegations of past injury, rather than a "real and immediate threat" facing association members in the future, *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1280 (D.C. Cir. 2012) (citation omitted), the Plaintiffs cannot establish associational standing for the purpose of gaining a prospective injunction. Lacking a justiciable case or controversy, "[t]he Constitution therefore requires that [the Plaintiffs] direct their objections to the Executive and Legislative Branches, not to the Judiciary." *Id.* at 1283.

## I. Background

EWG filed a Citizen Petition with the FDA on April 12, 2011, "requesting that the FDA take immediate action to protect the public from formaldehyde-containing keratin hair straighteners." Am. Compl. ¶ 41. The Petition asked the FDA to take three specific actions: (1) "[i]nvestigate and respond appropriately to the deceptive practices of companies that conceal the fact that their hair-straighteners release formaldehyde," (2) "[r]equire labels for hair-straighteners that contain . . . formaldehyde in solution, and formaldehyde-releasing chemicals that warn users about the risk of exposure during the treatment process, and (3) "[r]eview whether to ban the use of . . . formaldehyde in solution, and formaldehyde-releasing chemicals as ingredients in hair straighteners." Am. Compl. Ex. A at 3, ECF No. 19. About five months later, the "FDA sent EWG a tentative response . . . on or about September 6, 2011," explaining that "due to 'competing priorities' the agency was unable to reach a decision on the petition." Am. Compl. ¶ 63. On December 13, 2016, EWG filed this suit along with WVE, alleging that the FDA's failure to act on the petition violated the Administrative Procedure Act, the Food, Drug and Cosmetic Act, and the FDA's own regulations, and that the FDA and its Commissioner were required to act. Original Compl. ¶ 80 (Compl.).

The FDA requested additional time to respond to the complaint, and subsequently issued a formal response to the Petition on March 29, 2018. Am. Compl. ¶ 70-71. The response granted the Petition in part and denied it in part. Mot. Dismiss Ex. B at 1. The FDA "grant[ed]" EWG's request that the agency review the appropriateness of a ban, and discussed "next steps" in that process, including a pending "scientific evaluation" of the issue. *Id.* at 5. The FDA also explained that the agency "ha[d] in fact already" investigated certain manufacturers for deceptive advertising in the hair straightening[1] industry (even issuing public warning letters to two such manufacturers) and would "continue to take actions regarding specific products and/or manufacturers on a case-by-case basis as appropriate." *Id.* at 5-6. However, the FDA denied EWG's request to initiate rulemaking for a formaldehyde warning label, explaining that doing so "before [the] FDA has completed its analysis and has the opportunity to determine whether to propose a rule to ban the use of [formaldehyde] in hair smoothers [] is not the best use of [the] FDA's limited resources," and noting that "a rule requiring warning labels for hair smoothers is not necessary for FDA enforcement action." *Id.* at 6-7.

The Plaintiffs then amended their complaint, naming the FDA and its Acting Commissioner as defendants.[2] Instead of asking the Court to order the Defendants to merely "act on the Petition by a date certain," Compl. ¶ 80, the amended complaint seeks an order "[d]irecting Defendants to *grant* the Petition by a date certain." Am. Compl. ¶ 96 (emphasis added). The Defendants moved to dismiss the amended complaint for lack of jurisdiction under

---

[1] The Plaintiffs refer to hair straightening products, while the Defendants prefer the term hair smoothing products. At the motion to dismiss stage, this opinion will use the Plaintiffs' phraseology except when quoting the FDA's filings.

[2] Pursuant to Fed. R. Civ. P. 25(d), the current Commissioner, Scott Gottlieb, M.D., will be substituted for the former Acting Commissioner, Stephen M. Ostroff, M.D.

Fed. R. Civ. P 12(b)(1), and for failure to state a claim under Fed. R. Civ. P 12(b)(6). Mot. Dismiss, ECF No. 20.

The Plaintiffs attached two affidavits to the record via their opposition, with factual allegations that now form the heart of their standing claims. Melanie Benesh, an attorney employed by EWG, declares that "EWG has dedicated substantial time and economic resources . . . to focus [the] FDA's attention on regulating these harmful products, even to the detriment of . . . other important advocacy activities." Opp. Att. 1, Benesh Decl. ¶ 4, 6 (Benesh Decl). EWG has also undertaken education efforts, such as "investigative research and publish[ed] articles," "reports on these products," and the creation of a seal "to help consumers quickly identify personal care products meeting EWG's high safety standards," complete with a "specific part of the [safety seal] program specifically for formaldehyde related to hair keratin straighteners as a result of the FDA's delay in acting on the Petition." *Id.* at ¶ 4-7. "Over the past six years," Ms. Benesh claims that "EWG has incurred approximately $1,365,000 in total expenses to combat hazardous cosmetic ingredients . . . [a] substantial portion of [which] are attributable to EWG's efforts to address . . . formaldehyde in keratin hair straighteners, and were necessitated by the FDA's inaction on the Petition." *Id.* at ¶ 8.

Jamie McConnell, the Director of Programs and Policy at WVE, states that the organization has spent "approximately $371,000 [] over the past six years on the hair keratin straightener issue," despite WVE's annual budget of only "$500,000 per year," diverting "resources away from other issues" on which WVE engages in advocacy. Opp. Att. 2, McConnell Decl. ¶ 13 (McConnell Decl). Ms. McConnell says that "WVE currently has approximately twenty persons identified as salon workers in its membership database, but there are likely many more," and "many of these salon workers have been directly impacted by the

use/exposure to formaldehyde." *Id*. at ¶ 5. These members include "[s]alon worker Jennifer Arce" whose "symptoms from exposure to formaldehyde . . . escalated into bloody noses, blistery rashes, and choking on phlegm in her sleep," as well as "[b]ronchitis" and coughing up "chunks of blood." *Id*. at ¶ 6. The affidavit explains that "[t]he WVE website also tells the stories of other salon worker members, identified by first name only, who experienced similar symptoms to Arce," including "Dawn" and "Natalija." *Id*. at ¶ 7. These facts, the Plaintiffs contend, are sufficient to confer standing.

## II. Legal Standards

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting U.S. Const. art. III, § 2). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," and "[t]he concept of standing is part of this limitation." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 37 (1976) (citation omitted). "Relaxation of standing requirements is directly related to the expansion of judicial power," *Clapper*, 568 U.S. at 408-9 (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)), and the usurpation of "the powers of the political branches." *Id*. at 408. "To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id*. at 409 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)) (other citations omitted).

"The party invoking federal jurisdiction bears the burden of establishing [it]," *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (citation omitted), and when facing a motion to dismiss under Fed. R. Civ. P. 12(b)(1), must state a "plausible" claim to such an injury.

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted).[3] "While the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction . . . the court must still accept all of the factual allegations in [the] complaint as true." *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (internal quotation marks and citations omitted). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks and citations omitted).

"An organization . . . can assert standing on its own behalf, on behalf of its members or both." *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). For "organizational standing," the standard is the same as the one for individuals: the organization must show "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (*PETA*) (quoting *Equal Rights Ctr.*, 633 F.3d at 1138); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("we conduct the same inquiry as in the case of an individual"). To establish "associational standing," organizations must show that "(1) at least one of their members would have standing to sue; (2) the interests they seek to protect are germane to the organizations' purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." *Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014).

---

[3] Because I conclude that jurisdiction is lacking, I will not recite the Rule 12(b)(6) standards.

"Even if a plaintiff has suffered past harm from the kind of conduct the suit seeks to enjoin, the plaintiff must 'establish a real and immediate threat' that the harm-producing conduct will recur." *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1280 (D.C. Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

## III. Analysis

Both of the Plaintiffs assert organizational standing, while WVE also asserts associational standing. Opp. 13-16. For the reasons that follow, I conclude that both claims fail.

### A. Organizational Standing

The central question I must consider in an organization standing case is whether the plaintiff "has suffered a 'concrete and demonstrable injury to [its] activities,' mindful that, under our precedent, 'a mere setback to its abstract social interests is not sufficient.'" *PETA*, 797 F.3d at 1093 (quoting *Equal Rights Ctr.*, 633 F.3d at 1138). Standing jurisprudence in this arena arises from the Supreme Court's holding that a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379; *see Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (applying *Havens*). "Making this determination is a two-part inquiry—'we ask, first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Food & Water Watch, Inc.*, 808 F.3d at 919.

To satisfy the first prong—"an injury to its interest"—"an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services." *Id.* (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C.Cir. 2015)). Perceptible

impairment occurs when the challenged conduct causes an actual "inhibition of [the organization's] daily operations." *Id.* (quoting *PETA*, 797 F.3d at 1094). It will not suffice if the plaintiff can only assert an injury that "arises from the effect . . . on the organizations' lobbying activities," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C.Cir. 2005)), or the "'service' impaired is pure issue-advocacy—the very type of activity distinguished by *Havens*." *Id.* at 1162. Even if the operations at issue are focused on educating the public, "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995).[4] Here, neither organization has sufficiently alleged an "inhibition of [the organization's] daily operations," that would constitute a concrete injury to their interests. *Food & Water Watch, Inc.*, 808 F.3d at 919 (quoting *PETA*, 797 F.3d at 1094).

To be sure, the Plaintiffs allege significant expenses. EWG has spent "approximately $1,365,000 in total expenses to combat hazardous cosmetic ingredients," a "substantial portion"

---

[4] Similarly, a challenged action that deprives the plaintiff of information may constitute a concrete injury, but only if the loss actually inhibits the organization's ongoing work in a "concrete and specific" manner. *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 935-938 (D.C.Cir. 1986) (when defendant's regulations "significantly restrict[ed]" an otherwise "generous flow of information regarding services available to the elderly," "four organizations that endeavor[ed], through informational, counseling, referral, and other services, to improve the lives of elderly citizens" suffered "an injury both concrete and specific to the work in which they are engaged."); *PETA*, 797 F.3d at 1095 (because the "denial of access to bird-related [Animal Welfare Act] information including . . . investigatory information" hampered PETA's efforts "to seek redress for bird abuse," PETA's injury was "concrete and specific to [their] work" and constituted "a cognizable injury sufficient to support standing.").

of which is "attributable to EWG's efforts to address . . . formaldehyde in keratin hair straighteners, and were necessitated by the FDA's inaction on the Petition." Benesh Decl. at ¶ 8. WVE's tally is more concrete, reaching "approximately $371,000 [] over the past six years on the hair keratin straightener issue," despite WVE's annual budget of only "$500,000 per year." McConnell Decl. ¶ 13. But much of this money appears to have been spent on lobbying. And to the extent that the money was spent on educating the public, the Plaintiffs do not allege that these expenditures have imposed "operational costs *beyond those normally expended*." *Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1434) (emphasis added).

First, let us consider the Plaintiffs' advocacy expenses. "EWG has dedicated substantial time and economic resources . . . to focus [the] FDA's attention on regulating these harmful products," Benesh Decl. at ¶ 4, and "WVE has expended substantial effort to focus [the] FDA's attention on this issue," McConnell Decl. ¶ 9-13. But injuries to an organization's government lobbying and issue advocacy programs cannot be used to manufacture standing, because that would allow lobbyists on either side of virtually any issue to take the Government to court. *Ctr. for Law & Educ.*, 396 F.3d at 1161 ("This Court has not found standing when the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities (as opposed to the effect on non-lobbying activities)").[5]

---

[5] The Plaintiffs purport to rely on *Scenic America, Inc. v. U.S. Dep't of Transportation*, Opp. 15, which held that an organization's efforts to combat digital billboards conferred standing to challenge agency guidance which made such billboards easier to legalize at the state level. 983 F. Supp. 2d 170, 176-177 (D.D.C. 2013). But that opinion distinguished the organization's activities at the local level—"particularly its participation in local zoning board meetings to challenge specific billboards, its sharing of information in response to requests from affected communities, and its management of websites and email"—from standard issue advocacy. *Id.* at 178. The advocacy that EWG and WVE describe is classic lobbying at the federal level: "emails

Neither do the Plaintiffs' educational efforts suffice, because this type of work is exactly what these organizations always do. "EWG . . . is a research and advocacy organization dedicated to empowering people to live healthier through its educational reports, online guides, mobile apps, and related campaigns." Benesh Decl. ¶ 3. EWG has published numerous "consumer guides" on topics that include water filters and tap water, genetically modified food, pesticides in produce, seafood, cleaning products, sunscreens, cosmetics, "Safer Cell Phone Use," and bug repellants. Reply. Ex. A. Similarly, "WVE . . . is a woman led environmental organization with the mission of amplifying women's voices to eliminate toxic chemicals that harm health and communities." McConnell Decl. ¶ 3. WVE has also actively published educational reports on various topics, including "Toxic Chemicals in Feminine Care Products," Reply Ex. C, "What's Hiding in Your Cleaning Products," Reply Ex. D, "Health Hazards Associated with Toxic Exposure to Nail Salons," and the "Impacts of Toxic Chemicals on Salon Workers," which addressed formaldehyde in hair-straightening products, among other issues. Reply Ex. F. In sum, both organizations are squarely focused on warning the public about health hazards in consumer products. To the extent that the Plaintiffs rely on their anti-formaldehyde educational efforts, they offer no evidence that the FDA's alleged inaction required them to spend anything beyond their typical annual expenditures. *Cf. Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1434 ("There is no evidence that Section 13208 has subjected [plaintiff] to operational costs beyond those normally expended to review, challenge, and educate the public about revenue-related legislation."). Although the Plaintiffs allege that they have diverted resources to focus on this issue, they do not allege that these expenditures constituted "operational costs

---

and letters to [the] FDA," McConnell Decl. ¶ 12, and "actively working . . . to promote legislation in Congress." Benesh Decl. ¶ 6.

*beyond those normally expended*." *Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1434); *see also id*. at 926 (Henderson, J., concurring) ("[I]f an organization's standing to pursue litigation against the government is premised only on injury flowing from expenditures to educate the public, the suit amounts to no more than an assertion of generalized grievances about the conduct of Government, and organizational standing is lacking.").

The Plaintiffs attempt to rely on *PETA*, 797 F.3d 1087, but the standing allegations there were materially different. In that case, the D.C. Circuit concluded that PETA had standing to challenge the USDA's failure to apply the Animal Welfare Act's general regulations to birds, because the decision (1) meant that PETA was unable to protect birds through the usual process of submitting USDA complaints, and (2) deprived PETA of important investigatory information, hampering PETA's own protection efforts. *PETA*, 797 F.3d at 1094-95. But even under the permissive limits of current circuit precedent,[6] nothing similar is alleged here: no complaint procedures are foreclosed, and the Plaintiffs allege no informational injury. *See Food & Water Watch*, 808 F.3d at 921 (finding *PETA* inapplicable because "[plaintiff] does not allege that the [agency decision] limits its ability to seek redress for a violation of law. Nor does [plaintiff allege that the [agency] action restricts the flow of information that [plaintiff] uses to educate its members."). It is damage to organizational *activities* that an organization must allege, and the

---

[6] *See id.* at 1099 (Millett, J., dubitante) ("The majority opinion holds that standing exists because the government's *inaction* injured PETA's '*interest*' in having the Animal Welfare Act *enforced* against certain *third parties*, and because PETA *chose* to devote its own resources to make up for the government's enforcement '*omission*.' . . . If circuit precedent has brought us to the point where organizations get standing on terms that the Supreme Court has said individuals cannot, then it may be time, in an appropriate case, to revisit the proper metes and bounds of 'organizational standing.'") (emphasis in original).

Plaintiffs here only allege that their organizational *goals* have been impeded. *See Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) ("The court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised.")

In sum, lobbying expenditures will not suffice, and neither EWG nor WVE plausibly allege that their educational programs have been perceptibly impaired. I therefore conclude that the Plaintiffs have failed to carry their burden to establish organizational standing. *See Susan B. Anthony List*, 134 S. Ct. at 2342.

**B. Associational Standing**

Neither can WVE establish standing to sue on behalf of its members.[7] WVE lists three alleged WVE members who have suffered significant past injuries through exposure to formaldehyde in hair-straightening products: Jennifer Arce, "Dawn," and "Natalija." McConnell Decl. ¶¶ 6-7.[8] "However, a plaintiff who seeks prospective injunctive relief cannot establish standing based on past harm alone." *Coal. for Mercury-Free Drugs*, 671 F.3d at 1280. Rather,

---

[7] Because I conclude that jurisdiction is lacking on other grounds, I need not decide today whether "WVE fails to establish associational standing because it has not shown that it is a traditional membership organization or 'the functional equivalent' thereof." Reply 8 (citations omitted).

[8] The same declaration alludes to "approximately twenty persons identified as salon workers in [WVE's] membership database," asserting that "many of these salon workers have been directly impacted by the use/exposure to formaldehyde." *Id*. at ¶ 5. However, a plaintiff asserting standing bears the burden of offering "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498, (2009) (emphasis added); Reply 10 n. 11. I will therefore disregard any argument based on these unidentified members in the WVE database. However, I need not decide whether "Dawn" and "Natalija"—whose last names Ms. McConnell's declaration does not provide—have been sufficiently "identified" for purposes of standing, *id.*, since their alleged injuries are materially indistinguishable from those suffered by Jennifer Arce. McConnell Decl. ¶ 6-7.

"the plaintiff must 'establish a real and immediate threat' that the harm-producing conduct will recur." *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects. . . . [P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."). That test is not satisfied here.

As an initial matter, the relief that Plaintiffs seek is purely prospective and injunctive in nature. They ask that "the Court enter judgment . . . [d]eclaring that Defendants have unreasonably delayed and unlawfully withheld action on the Petition . . . [d]eclaring that Defendants' actions . . . are arbitrary and capricious . . . and [d]irecting Defendants to grant the Petition by a date certain." Am. Comp. 31. The Plaintiffs also ask that the Court retain jurisdiction "to ensure that Defendants comply," for an award of "costs and disbursements incurred in connection with this action," and for "such other and further relief as the Court deems just and proper." *Id.* In sum, the Plaintiffs want this Court to declare that the Defendants are legally obligated to grant the Petition's requests, order compliance, and then supervise the Government's performance. Such an order would force the FDA to investigate deceptive labeling in the manner that the Petition requests, and kick-start the regulatory process for instituting a ban on formaldehyde-producing chemicals in hair-straightening products. *Compare* Am. Compl. Ex. A at 3 (the Petition's "Actions Requested") *with* Mot. Dismiss Ex. B at 5-7

(explaining the "FDA's Responses to [the Petition's] Requested Actions"). That is the essence of prospective injunctive relief.[9]

In contrast, the injuries that WVE alleges occurred in the past. McConnell Decl. ¶¶ 6-7 (Jennifer Arce "described symptoms that escalated," "had" bronchitis, and "cough[ed] up chunks of blood," while Dawn and Natalija "experienced similar symptoms") (alteration original). Ms. McConnell does not allege that the injured individuals will likely use or be exposed to formaldehyde-releasing hair straightening products in the future. *Id.* at ¶¶ 5-7. The declaration does not even speculate about possible future injuries, although such conjecture would also be insufficient. *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007) ("The Supreme Court has repeatedly held that disputes about future events where the possibility of harm to any given individual is remote and speculative are properly left to the policymaking Branches, not the Article III courts.") Indeed, the WVE report titled "Beauty and Its Beast: Unmasking the Impacts of Toxic Chemicals on Salon Workers" states that "formaldehyde"— in "keratin hair straighteners" specifically—"can be avoided by using currently available salon products containing safer alternatives." Reply. Ex. F at 5. In contrast, the same report lists numerous "chemicals . . . which may be difficult to avoid due to a lack of safer available alternatives." *Id.*

The available record makes this case similar to *Coalition for Mercury-Free Drugs v. Sebelius*, in which the D.C. Circuit held that an association and several of its members who had been injured by thimerosal-preserved vaccines lacked "standing to challenge [the] FDA's

---

[9] To the extent that the Plaintiffs seek a declaration that the Defendants have unlawfully failed to *act* on the Petition, rather than an order requiring the Defendants to *grant* the Petition, that claim has been mooted by the FDA response.

decision to allow *other people* to receive thimerosal-preserved vaccines." 671 F.3d at 1277 (emphasis original). Although the plaintiffs in that case, unlike this one, explicitly alleged "a fear of future exposure," they "[did] not claim that *they* intend[ed] to receive thimerosal-preserved vaccines in the future," and "they acknowledge[d] that thimerosal-free versions of all essential vaccines . . . are available on the market." *Id.* at 1280. In light of these facts, the D.C. Circuit concluded that "plaintiffs cannot show that they face a 'certainly impending,' or even likely, risk of future physical injury from thimerosal in vaccines." *Id.*

The same logic applies here. Confronted with only past injuries to WVE's members, no allegations that these members or others are likely to use or be exposed to formaldehyde-releasing hair straighteners in the future, and evidence from WVE itself indicating that alternative products are available on the market, I cannot conclude that future injuries constitute a "real and immediate threat" to WVE's members. *Id.*

All of the cases upon which Plaintiffs rely, Opp. 16, involved allegations of impending future injuries. *Ctr. for Biological Diversity v. EPA,* 861 F.3d 174, 183 (D.C. Cir. 2017) (association members planned to view threatened insects); *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 53-54 (D.C. Cir. 2016) (association member lived in area affected by digital billboards); *Sierra Club v. EPA*, 755 F.3d 968, 974 (D.C. Cir. 2014) (four association members lived near refineries set to process "the very hazardous materials that are the subject of the challenged regulation"). Allegations of past injuries will not suffice. Accordingly, WVE has failed to establish associational standing.

## IV. Conclusion

Accepting all of the Plaintiffs' allegations as true, they have ultimately "alleged nothing more than an abstract injury to [their] interests that is insufficient to support standing." *Food &*

*Water Watch, Inc.*, 808 F.3d at 921. The Defendants' motion to dismiss for lack of jurisdiction will therefore be granted. A separate order will issue.

Dated: March 19, 2018

TREVOR N. MCFADDEN
United States District Judge